# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-60497-CIV-ROSENBAUM/SELTZER

CLIFFORD B. ORETSKY,

      Plaintiff,

v.

INFINITY INSURANCE COMPANY,

      Defendant.

_____/

### ORDER

This matter is before the Court on Defendant's Amended Motion for Final Summary Judgment [D.E. 16] and Plaintiff's Motion for Summary Judgment [D.E. 27]. The Court has carefully considered the parties' motions, all supporting and opposing filings, and the entire record. For the following reasons, the Court now grants Defendant's Amended Motion for Summary Judgment.

### I. Material Facts[1]

Defendant Infinity Insurance Company ("Infinity") is an Indiana corporation with its principal place of business in Alabama. *See* D.E. 4 at ¶ 3. In this matter, Plaintiff Clifford B. Oretsky ("Oretsky") sues Defendant Infinity for breach of contract for failure to provide coverage under an

---

[1] The Court has set forth the material facts based on its review of Defendant's Statement of Material Facts [D.E. 17], Plaintiff's Response to that Statement [D.E. 39-1], Defendant's Response to Plaintiff's Statement [D.E. 42] and the declarations and depositions of the parties' witnesses. In accordance with Local Rule 7.5(d), all material facts set forth in Defendant's Statement of Material Facts and in Plaintiff's Additional Statements of Material Facts [D.E. 39-1 at 5] and supported by evidence of record are deemed admitted unless controverted by Plaintiff's and Defendant's Responses to those Statements, respectively.

insurance policy for the theft of Plaintiff's 2010 Maserati Quattraporte ("Maserati"). *See* D.E. 1-7; D.E. 27. Specifically, Plaintiff asks this Court to find that the insurance policy at issue provides coverage for the theft of Plaintiff's Maserati. *Id.* This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are diverse and the matter in controversy exceeds $75,000, exclusive of interest, costs and attorney's fees. *See* D.E. 1.

This dispute arises from the theft of Plaintiff's Maserati (the "Maserati") on about July 21, 2011 ("theft"). D.E. 1-7 at ¶ 8; D.E. 17 at ¶ 8. At the time of the theft, the Maserati was insured under Infinity insurance policy number 017-72-55-47-00 (the "Policy"). *See* D.E. 17 at ¶ 1; *see also* D.E. 37-11 at ¶ 11. Plaintiff obtained this Policy through Sentinel Casualty Insurance, Inc., an insurance agent appointed by Defendant to solicit and receive insurance applications. D.E. 24 at ¶ 2.

After the theft, Oretsky timely submitted claim number 1001115314 ("Claim") to Infinity. *See* D.E. 42-7 and D.E. 37-5 at 2. Infinity responded to the Claim with a reservation-of-rights letter dated July 25, 2011, stating,

> [I]nfinity Insurance reserves the right to deny and/or void any coverage under the policy . . . for the claimed loss arising out of the automobile theft which reportedly occurred on July 21, 2011 for the following reason(s)
>
> > * Acceptable vehicle usage. The covered auto must be kept in a garage when not in use.
>
> For the reason(s) and for any other valid reasons known or which may become known, you are hereby notified that any action taken by Infinity Insurance . . . shall not waive any of the terms or conditions of an applicable policy of insurance or other rights under the law ,nor shall such action waive any of your rights under the policy.
>
> Infinity Insurance does not intend by this letter to waive any policy

2

defenses in addition to those noted above, but specifically reserves its right to assert additional defenses at any time.

*See* D.E. 42-7 at 6-7.

Subsequently, on August 8, 2011, Infinity denied the Claim, explaining,

[W]e must, respectfully, deny any and all claims presented against this Infinity Insurance Company Policy resulting from this accident. Please review **Your Florida Classic Collectors Auto Policy** endorsement Form Number PP70270704, under **Part F - General Provisions,** which states in part;

. . .

ACCEPTABLE VEHICLE USAGE

In consideration of the premiums charged under this policy, you agree that **your covered auto: . . .**

2. will be kept in a completely enclosed, locked, and permanent facility when not in use;

Violation of above limitations without prior consent or acknowledgment from the company void all coverage provided in this policy.

D.E. 42-7 at 1-2.  The sole issue before this Court is whether Plaintiff is entitled to coverage under the Policy for the theft of the Maserati.  *See* D.E. 17 and D.E. 27.

The day before the theft, Plaintiff, intending to leave his home early in the morning to pick up his wife from the airport, parked the Maserati in the driveway of his home (outside his garage), so that the noise from the vehicle would not disturb his son in the morning.  D.E. 24 at ¶¶ 26, 27.  The Maserati remained in that location until it was stolen in the early morning hours of July 21, 2011.  D.E. 17 at ¶18.

Prior to the theft, Plaintiff had left the Maserati outside his available fully-enclosed and

3

locked garage on at least twenty occasions during the policy term.  D.E. 17 at ¶19.  Plaintiff also had

been using the Maserati during the policy term to go to the store, out to dinner, and, on a frequent

basis, to play golf at his club, since he had loaned his other vehicle, a Mazda 6, to his mother-in-law.

*See* D.E. 17 at ¶¶ 13 and 14.

## II. Procedural History

On February 9, 2012 Plaintiff filed his Complaint in the Circuit Court of the Seventeenth

Judicial District, in and for Broward County, Florida.  D.E. 1 at ¶ 3; *see* D.E. 1-1.  Defendant Infinity

then removed the case to this Court, based on diversity jurisdiction.  *See* D.E. 1.  Arguing that the

Policy does not provide coverage for any claims arising out of the theft of the Maserati on July 21,

2011, Defendant now seeks summary judgment in its favor.  *See* D.E. 16.  In response, Plaintiff

Oretsky filed a dueling Motion for Summary Judgment asking this Court to find that the Policy

provides coverage for the theft of the Maserati.  *See* D.E. 27.

## III.  Analysis

### A.  Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that

there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48

(1986) (emphasis in original).  A dispute is genuine if "a reasonable trier of fact could return

judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d

1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would

affect the outcome of the suit under the governing law ."  *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).   Further, the Court does not weigh conflicting evidence.   *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).   Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam).   Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"   *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (per curiam) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).   Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

### B.  Applicable Law on Insurance Policy Interpretation

Since the parties premise jurisdiction in this case on diversity grounds, this Court must determine the law applicable to this matter by looking to Florida's choice-of-law rules. *Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.*, 165 F. Supp. 2d 1332, 1335 (S.D. Fla. 2001) (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997); *Bituminous Casualty Corp. v. Advanced Adhesive Technology, Inc.*, 73 F.3d 335, 337 (11th Cir. 1996)).   As Florida law pertains to choice of law in the context of contract interpretation, the

Florida Supreme Court has "long adhered" to the rule of *lex loci contractus*. *Infinity Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). That rule provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties. *Id.* (citing *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988)). In a case involving an insurance policy, the place where the contract was executed is "generally considered to be the place where the policy is delivered." *Adolfo House*, 165 F. Supp. 2d at 1335 (citing *Sturiano v. Brooks*, 523 So. 2d 1126 and *Bloch v. Berkshire Ins. Co.*, 585 So. 2d 1137 (Fla. 3d DCA 1991)).

Here, the Policy was issued to Florida policy holders, and the theft that gave rise to this dispute occurred in Florida. *See* D.E. 17 at ¶8.; D.E. 1-1 at 4. Moreover, Defendant issued to Plaintiff a "Florida Classic Collector's Auto Policy" in Florida, which Plaintiff appended to his Complaint. *See* D.E. 1-1 at 4, 13.[2] Thus, this Court looks to Florida law to interpret the Policy at issue.

In Florida, "[w]here the duty of an insurer rests upon the legal effect of the provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court to determine, and is therefore amenable to summary judgment." *Great Am. Fid. Ins. Co. v. JWR Constr. Servs., Inc.*, No. 10-61423-CIV, 2012 WL 1193848 (S.D. Fla. Apr. 9, 2012). Here, the sole issue presented to the Court is whether Plaintiff is entitled to coverage under the Policy's terms at the time of the Maserati's theft. D.E. 16 at 2; D.E. 27 at 1.

"Under Florida law, insurance contracts are construed according to their plain meaning." *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291-292 (Fla. 2007) (quoting *Taurus Holdings, Inc. v. U.S.*

---

[2] "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. Pro. (10)(c).

*Fid. and Guar. Co.*, 913 So. 2d 528 (Fla. 2005)) (internal quotation marks omitted). The plain and unambiguous meanings are interpreted as they would be understood by the "man-on-the-street." *Harrington v. Citizen Property Ins. Corp.*, 54 So. 3d 999, 1001-1002 (Fla. 4th DCA 2010) (quoting *Infinity Fire and Cas. Co. v. Castillo*, 829 So. 2d 242, 245 (Fla. 3d DCA 2002))(internal quotations omitted). "[A]mbiguities[,] [on the other hand,] are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA1997) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467 (Fla. 1993)). But,"[i]f the language employed in the policy is clear and unambiguous, there is no occasion for construction or the exercise of a choice of interpretations. In the absence of ambiguity . . . it is the function of the court to give effect to and enforce the contract as it is written." *Id.* (quoting *U.S. Fire Ins. Co. v. Morejon*, 228 So. 2d 223, 225 (Fla. 3d DCA 1976)).

Whether a provision is ambiguous is determined by the language of the policy and not the subjective intent of the parties. *See Harrington*, 54 So. 3d at1001-1002. An ambiguity arises when more than one interpretation can fairly be given to a policy provision. *Infinity Fire & Cas. Co., v. Metro. Dade Cnty.*, 639 So. 2d 63, 65 (Fla. 3d DCA 1994). But a provision is not ambiguous simply because it requires analysis or because it is complex. *Garcia*, 969 So. 2d at 291(citing *Swire Pac Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)). As the *Garcia* Court explained,

> When interpreting insurance contracts, we may consult references commonly relied upon to supply the accepted meanings of words. *See Gov't Employees Ins. Co. v. Novak,* 453 So. 2d 1116, 1118 (Fla.1984) (citing *Webster's Third New International Dictionary* 11 (1966) to define "accident"); *Beans v. Chohonis,* 740 So. 2d 65, 67 (Fla. 3d DCA 1999) ("One looks to the dictionary for the plain and ordinary meaning of words.").

*Garcia*, 969 So. 2d at 292. In addition, courts derive an understanding of the terms of an insurance

policy by looking the policy as a whole. *Garcia*, 929 So. 2d at 291; *see also Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Indeed, it is important for a court to ". . . read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (citation omitted). With these concepts in mind, the Court now considers the particular policy language at issue.

**C.  The Merits of the Motion for Summary Judgment**

*1.  Part F Governs the Terms of Coverage of the Maserati*

Infinity asserts that "Part F - General Provisions" of the Policy precludes coverage here. Part F states, in pertinent part,

> The following is added to the policy.
>
> ACCEPTABLE VEHICLE USAGE
>
> In consideration of the premiums charged under this policy, you agree that **your covered auto**:
>
> 1.  will be used for exhibitions, club activities, parades, [sic] other functions of public interest or an occasional pleasure drive;
>
> 2.  will be kept in a completely enclosed, locked, and permanent garaging facility when not in use;
>
> 3.  will not be driven more than the mileage plan selected during the policy period, and;
>
> 4.  will not be used for:
>
>     a.    backup transportation
>
>     b.    commuting (driving to and from school or work)
>
>     c.    business or commercial purposes;

8

* * * * *

    d.       participating in, practicing or testing for any racing, speed contest, time trial or track event of any kind.

Violation of above limitations without prior consent or acknowledgment from the company void all coverage provided under this policy.

D.E. 37-1 at 30; *see* D.E. 17 at ¶¶ 4, 5, and 6 and D.E. 24 at ¶¶ 4, 5, and 6 (emphasis in original). According to Infinity, coverage for the Maserati was voided because the car (1) was not kept in a "completely enclosed, locked, and permanent garaging facility when not in use" at the time that it was stolen; (2) was driven in excess of the mileage plan selected during the policy period; and (3) was used for backup transportation.

Oretsky retorts that all of these reasons for denying coverage must fail because Part F of the Policy does not apply to the Maserati. More specifically, Oretsky notes that Part F of the Policy is part of the Collectible Vehicle Endorsement and posits that that Endorsement applies only to "collectible vehicle[s]," a Policy definition under which the Maserati does not qualify. *See* D.E. 39-1 at ¶¶ 4-6; D.E. 27 at 2-3. Two problems with Oretsky's argument exist. First, by its terms, the Policy covers the Maserati only if it complies with the terms of the Collectible Vehicle Endorsement. And second, the definition of "collectible vehicle" does not preclude coverage of the Maserati under the Policy because coverage of the Maserati is not dependent upon the Maserati's qualifying as a "collectible vehicle."

The first page of the Policy lists as incorporated endorsements to the Policy Endorsements 05028N0704 and PP70270704, among others. *Id.* Endorsement 05028N0704 states, "The 'Classic & Collectible Vehicle' endorsement [PP70270704] attached to your policy limits our liability of loss

9

from damage to your auto(s) . . . ." D.E. 37-1 at 22. Endorsement PP70270704, in turn, defines "your covered auto" as "[a]ny vehicle shown in the policy Declarations. It must also meet the terms of acceptable vehicle usage as defined in Section F." D.E. 37-1 at 29. Significantly, the only vehicle listed on the Policy Declarations page is the Maserati. *See* D.E. 37-1 at 2. Thus, the vehicle — in this case, the Maserati — shown in the Policy Declarations page is covered under the Policy, without the need to resort to any other definition — including that of "collectible vehicle." And second, usage of that vehicle — the Maserati — must satisfy the terms of "acceptable vehicle usage as defined in Section F" in order to be covered at the time of loss. *Id.* Section F likewise imposes its terms on "your covered auto." *See* D.E. 37-1 at 30. Nothing about this Policy is ambiguous.

Nor, as Oretsky suggests, does inclusion in the Collectible Vehicle Endorsement of a definition for "collectible vehicle" somehow affect this analysis. *See* D.E. 25 at 2-4; D.E. 27 at 2-4; D.E. 45 at 1, 3-4, 5. The Collectible Vehicle Endorsement applies both to "your covered auto" under Section J of the Collectible Vehicle Endorsement and to any "newly acquired auto . . . [that the Policy holder] become[s] an owner of during the policy period," which also satisfies the conditions of Section K of the Endorsement. *See* D.E. 37-1 at 29. "[N]ewly acquired auto" includes within its definition a "collectible vehicle" that otherwise satisfies the requirements of the definition of "newly acquired auto." *See id.* at 29, Section K.1. Thus, the Collectible Vehicle Endorsement includes the definition of "collectible vehicle" not to somehow limit coverage of vehicles shown on the Policy Declarations page that therefore qualify as "your covered auto," but instead to limit coverage of any new vehicles that the Policy holder might obtain while the Policy is in force. Because the Maserati appears on the Declarations page and therefore falls under the category of "your covered auto" under the Policy, the Maserati did not also have to satisfy the definition of "collectible vehicle" for the

Collectible Vehicle Endorsement to apply to it.

Moreover, Oretsky must have known that the limitations appearing in Section F of the Policy would govern the Maserati's coverage at the time that he applied for the Policy. In this respect, the application for insurance coverage that Oretsky submitted specified that the coverage for which Oretsky was applying was provided by the "Classic Collectors Insurance" program and identified the Maserati as the only car for which coverage was sought. *See* D.E. 17-3 at 2, 3, 4. Oretsky also initialed certain "program requirements" in the insurance application, thereby agreeing that he would comply with these requirements that were later set forth in the issued Policy at Section F:

> 1. Each licensed driver in household has a regularly daily-use vehicle.
> * * * * *
> 3. Vehicles insured under this policy will be kept in a permanent enclosed and locked garage at all times when not in use.
> * * * * *
> 5. Vehicles usage will not exceed the mileage plan selected.
> 6. Vehicles insured under this policy will not be used for commuting to work or school, business use, daily transportation or as a substitute for another auto.

D.E. 17-3 at 4. In addition, this same page of the Policy application, which Oretsky signed, stated,

> THE FOLLOWING IMPORTANT CONDITIONS APPLY TO THIS INSURANCE:
>
> 1. Annual mileage is limited (based on plans elected) and usage is restricted to occasional pleasure driving, car shows, parades and club events.
> 2. Vehicles are not to be used for daily transportation, commuting, business, or to run errands.
> 3. Policy excludes racing, race testing, speed trials, any on-track or similar events.
> * * * * *

*Id.*

11

Thus, Oretsky should have known full well that the Policy would be governed by these conditions and that the conditions generally applicable to collectible vehicles would apply to coverage of the Maserati. Indeed, the cover page of the Policy is entitled, "YOUR FLORIDA CLASSIC COLLECTORS® AUTO POLICY," in what appears to be at least 24-point type. D.E. 37-1 at 11. In short, the Collectible Vehicle Endorsement, including Section F, applies to the Maserati.

## 2. The Garaging Condition

As noted previously, Section F mandates that the Maserati "will be kept in a completely enclosed, locked, and permanent garaging facility when not in use." D.E. 27-1 at 30. In this case, Oretsky admits that the Maserati was kept in the driveway outside his home (outside his fully enclosed and locked garage) the day before the theft and it stayed in that location until it was stolen, D.E. 17 at ¶ 18. Further, Oretsky specifically states that he intended to park the vehicle outside his garage, overnight, because he wanted to leave his home early in the morning and did not want to wake his son from the noise of the car. D.E. 24 at ¶ 28. Because Oretsky did not obtain prior consent or acknowledgment from Infinity to leave the Maserati outside the garage overnight, Infinity asserts that, under the terms of the Policy, Oretsky's actions voided any coverage for the Maserati at the time of its theft.

Oretsky disagrees, contending that the Maserati was "in use" as that phrase is commonly understood, at the time that it was stolen. D.E. 25 at 6. Alternatively, Oretsky argues that phrase "not in use" is ambiguous. *Id.*

In support of this position, Oretsky relies on a Texas case, *Continental National American Co., Ltd. v. Gauldin*, 594 S.W. 2d 793 (Tex. App. 1980). In *Gauldin*, the Texas court considered a

boat insurance policy that provided, "It is hereby warranted that the insured vessel is stored or kept in a locked garage or locked storage building when not in use." *Gauldin*, 594 S.W. 2d at 794. Under the facts of *Gauldin*, the insured kept his vessel in a locked garage at a location different from where he resided. The day that the theft occurred, the insured retrieved his boat from the garage and took it to a lake where he apparently used it. At about 8:00 p.m. that same night, the insured returned to his residence for dinner and to watch a sports event on television on his way back to returning the vessel to the garaging facility. During that time, he left the boat secured to his car by a locked chain and trailer hitch, parked on the street outside his apartment. When the insured went to return the boat to the garage later that night, he found that it had been stolen. The insurance company argued that the loss was not covered because the boat had not been stored or kept in a locked garage at the time of the theft. The Texas court disagreed, explaining that, technically, a boat can be "in use" only while it is on the water, but noting that even the insurance company conceded that a vessel would be covered under the policy while it was in transport to the body of water. Thus, the court concluded, "the boat must be covered not only while in actual operation on the water, but also during those activities incidental to its use. . . . At a minimum, . . . [such incidental activities] would include transport to and from the water, together with interim stops of the temporary nature exhibited by the facts of this case." 594 S.W.2d at 794.

Even setting aside the fact that Florida, not Texas, law applies here, this Court finds that *Gauldin* does not compel the conclusion that Oretsky urges. Significantly, *Gauldin* involved a boat, which cannot be operated on roads but, nonetheless, must be driven over roads to allow the owner to use it. This case, on the other hand, regards a car, which is made for the purpose of driving on roads. Also unlike the *Gauldin* insured, Oretsky stored his insured vehicle in a garage at his own

13

residence.  Therefore, unlike with a boat — or even with a collectible car that is generally stored at an offsite facility — an owner's parking of his car at his own residence overnight is not "incidental" to the use of the car where the garage where the car would otherwise be stored is located on the same premises.  Under these circumstances, the car owner can just as easily operate and use his car within the next several hours, whether it is parked in his driveway or in his own garage.

Nor do the facts in this case involve a "stop[] of a temporary nature," as *Gauldin* describes. Unlike the *Gauldin* vessel, the Maserati was neither on its way directly or indirectly to or from the garage where it was to be stored.  It was similarly not parked temporarily at a location to which Oretsky drove while operating the car, such as the airport.  Instead, Oretsky simply chose to park the Maserati on the driveway, immediately outside the garage where it was supposed to have and easily could have been left.  While the Court understands that Oretsky did so to avoid waking his son, that fact does not change the nature of the stop.  Even under *Gauldin*, therefore, the Maserati was not "in use" as that phrase is commonly understood.

For these same reasons, there is similarly nothing ambiguous about the garaging requirement in the Policy.  Moreover, besides the provision set forth in Section F requiring that the Maserati be "kept in a completely enclosed, locked, and permanent garaging facility when not in use," the application that Oretsky signed in order to obtain the Policy required him to initial the condition that "[v]ehicles insured under this policy will be kept in a permanent enclosed and locked garage *at all times* when not in use." D.E. 18-2 at 5 (emphasis added).  In addition, the application explained that initialing the conditions set forth, including the garaging one, "INDICAT[ES] THAT YOU WILL COMPLY WITH THESE REQUIREMENTS." *Id.* (emphasis in original).  In short, under the terms of the Policy, by parking in the driveway when he could have just as well left his car in the garage

14

on the same property, Oretsky knowingly chose to take on the risk of loss himself.[3]

### 3.  The Garaging Provision Is Not Rendered Inapplicable Because the Keys Were Stolen from the Garage

Oretsky next contends that the fact that the Maserati was not locked in a garage when it was stolen cannot void coverage under the Policy because the thief used the Maserati's keys to steal the Maserati, and the keys were located in the locked garage that the Maserati would have been in, had Oretsky complied with the garaging requirement.  Thus, in Oretsky's opinion, Oretsky's failure to house the Maserati in a garage did not prejudice Infinity, so it cannot void coverage.  In support of this argument, Oretsky relies on *State Farm Mutual Automobile Insurance Co. v. Curran*, 83 So. 3d 793 (Fla. 5th DCA 2011).

In *Curran*, the insured's policy listed a number of duties with which the insured as claimant was required to comply, including that the insured "be examined by physicians chosen and paid by [the insurer] as often as [the insurer] may reasonably require."  *Id.* at 800.  The court found that the insured had breached the insurance contract by effectively refusing to submit to a compulsory medical examination as required by the policy.  *Id.* at 801-02.  Nevertheless, the court determined that the insured's failure to comply with her duty to undergo the required medical examination did not result in forfeiture of insurance coverage under the policy.  But it reached this conclusion because although the policy provided that no right of action against the insurer would exist until all policy terms had been met, "nothing in the language of the policy impose[d] a forfeiture of benefits in the event of a breach of the duty to submit to a [medical examination]."  *Id.* at 802.  For this reason, the

---

[3]This was not the first time that Oretsky, through his actions, chose to bear the risk of loss.  In his deposition, Oretsky testified that he had parked his Maserati in the driveway approximately twenty times during the Policy term.

court reasoned that a prejudice analysis should apply. *Id.*

In addition, the court reasoned, the insured's failure to submit to the required medical examination involved a breach of a "condition subsequent" in the insurance policy, and under the language of the policy, the insured's deficiency only suspended performance by the insurer until the shortcoming could be cured by the insured. *Id.* at 803-04. In *Curran*, after filing suit, the insured offered to submit to the required medical examination, but the insurer declined, instead attempting to obtain a ruling that the insured had forfeited her coverage through her earlier refusal to undergo the required medical examination. Under these circumstances, the court held that the insured's action could proceed in spite of her earlier failure to comply with the medical-examination requirement.

This case differs materially from *Curran*. First, unlike in *Curran*, where the breach of the insured's duty transpired after the occurrence giving rise to the claim had already happened, in the pending matter, Oretsky's failure to comply with his responsibility to keep the Maserati housed in a garage when the vehicle was not in use happened before the theft for which Oretsky seeks coverage and arguably contributed to the loss. Thus, in contrast to the duty at issue in *Curran*, the requirement here was not a condition subsequent, but a condition precedent. Indeed, in order for the Policy even to have been issued, Oretsky had to affirmatively agree that he would keep the Maserati in a locked garage because housing the Maserati in a locked facility versus out in the open where anyone could see and touch it affected the risk that Infinity was taking. Whether the *Curran* insured took a medical examination after the triggering occurrence, however, had no bearing on the risk that the insurance company undertook in evaluating the risk of insuring her in the first place.

Second, whereas the *Curran* policy did not void coverage for the insured's failure to endure

16

a medical examination, the Policy here expressly states, "Violation of [the garaging requirement] without prior consent or acknowledgment from the company *void[s] all coverage provided under this policy*." D.E. 37-1 at 30 (emphasis added). As a result, unlike the insured in *Curran*, Oretsky was on notice from the start that his failure to comply with the garaging requirement would render void his coverage under the Policy. For these reasons, this Court disagrees that Infinity is required to demonstrate prejudice before denying coverage.

But even if it were, the result would be the same. As Joy Lietch, a manager working in the Specialty Auto Underwriting Department of Infinity, explained, "Infinity . . . relied on the representations [that Oretsky would keep his Maserati in a garaging facility when not in use] in determining whether to issue the [Policy] . . . and in determining the amount of premium to charge for [the Policy]." D.E. 17-4 at ¶¶ 5-6. It did so because it "consider[ed] the representations set forth . . . above to be material to the risk that underlies the [Policy] . . . ." *Id.* at ¶ 7. Obviously, housing the Maserati in a garage when not in use addresses more than the concern that an extra obstacle to theft be imposed; it also hides the vehicle from view and thereby reduces the risk in the first place that someone who wishes to steal a Maserati will see it and know that it is located at the insured's residence. By parking the car in plain view instead of in an enclosed garage, Oretsky did prejudice Infinity.

### 4. The No Backup Transportation Condition

While Oretsky is not entitled to coverage for the Maserati for the reasons set forth above, at least one other independent reason disqualifies Oretsky from recovering from Infinity under the Policy. Specifically, the Policy expressly prohibits use of the Maserati for "backup transportation." D.E. 37-1 at 30. This limitation also appears in Oretsky's insurance application where Oretsky

initialed next to the requirement that "[v]ehicles insured under this policy will not be used for commuting to work or school, business use, daily transportation or as a substitute for another auto." D.E. 37-1 at 6.

At about the time of the theft, however, Oretsky had loaned his other vehicle to his mother-in-law and was using the Maserati to go to the store, out to dinner, and, on a frequent basis, to play golf at his club and to watch his son play in golf tournaments. D.E. 17 at ¶¶ 12, 13. Oretsky's reliance on his Maserati as his sole means of transportation while his mother-in-law used his other car constituted "backup transportation"[4] and violated Section F, thereby voiding coverage.

Oretsky contends, however, that Infinity's failure to raise the backup transportation violation as a basis for denying coverage in the original letter declining coverage waived Infinity's ability to rely on that as a grounds in this lawsuit for denying coverage. But the reservation-of-rights letter specifically states that Infinity does not intend to waive any policy defenses in addition to the garaging requirement raised in the letter. D.E. 42-7 at 2. Moreover, Infinity properly raised the defense in its Answer, so Oretsky has not been prejudiced in any way. Finally, the Eleventh Circuit has held that an insurer's failure to raise in a denial letter a defense based on a policy exclusion does not waive that defense. *Transam. Leasing, Inc. v. Inst. of London Underwriters*, 267 F. 3d 1303, 1309 -10 (11th Cir. 2001). Therefore, Oretsky's claim was properly denied for the independent reason that he violated the backup-transportation prohibition.

---

[4] Infinity also contends that the mileage requirement was violated, providing yet another separate basis for denying coverage. While the undisputed fact show that Oretsky drove approximately 13,000 miles during the Policy period although the Policy limited his mileage to 5,000 miles during that same time, the Court need not consider this matter, in light of the fact that summary judgment must be granted for Defendant, regardless.

### *IV.  Conclusion*

_____For the foregoing reasons, Defendant Infinity's Motion for Summary Judgment [D.E. 16] is

**GRANTED**, and Plaintiff's Motion for Summary Judgment [D.E. 16] is **DENIED**.  Pursuant to

Rule 58, Fed. R. Civ. P., the Court will enter a separate judgment consistent with this Order.

    **DONE** and **ORDERED** at Fort Lauderdale, Florida, this 31st day of December 2012.


                                    ROBIN S. ROSENBAUM
                                    UNITED STATES DISTRICT JUDGE

cc:    The Honorable Ted E. Bandstra
       Counsel of Record